IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| K.C. 1986 LIMITED PARTNERSHIP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 02-0853-CV-W-NKL |
| | ) |
| READE MANUFACTURING, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Pending before the Court is a Motion for Stay of Execution Pending Appeal collectively filed by K.C. 1986 Limited Partnership ("KC 1986"), Donald Horne, Victor Horne, and DeAngelo Brothers, Inc. ("DeAngelo") (collectively "Appellants") [Doc. # 432]. For the reasons set forth below, the Court grants the Appellants' Motion, on the condition that the Appellants post a supersedeas bond in accordance with this Order.

**I.     Background**

**A.     Allocation Order [Doc. # 399]**

The underlying dispute between the parties involves the allocation of costs that are necessary to clean up a contaminated piece of property on Armour Road, in North Kansas City, Missouri ("the Site").

In January 2005, the Court entered an Allocation Order setting out how much each party must contribute to the cleanup of the Site. Regarding expenses that had already been paid to clean up the Site, the Court found that Borax had incurred cleanup response

1

costs of $1,164,597.62 through March 31, 2004. *See* Allocation Order [Doc. # 399] at p. 55. The Court found that DeAngelo must pay Borax 15% of the past response costs; Victor Horne must pay Borax 15% of the past response costs; Donald Horne must pay Borax 40% of the past response costs; and K.C. 1986 must pay Borax 20% of the past response costs.

In the same Order, the Court also allocated future response costs for the Site in a similar fashion with Borax paying 10% of the future cleanup costs and the remaining parties cumulatively paying 90% of the future cleanup costs. Specifically, the Court held that DeAngelo must contribute 15% of future cleanup costs; Victor Horne (in his individual capacity) must contribute 15% of future cleanup costs; Donald Horne (in his individual capacity for the Habco Era) must contribute 18% of future cleanup costs; K.C. 1986 must contribute 20% of future cleanup costs; and Donald Horne (in his individual capacity for the KC 1986 Era) must contribute 22% of future cleanup costs.

B. **Prejudgment Interest Order [Doc. # 428]**

In a subsequent Order issued in April 2005, the Court awarded prejudgment interest to Borax on the past response costs set forth in its Allocation Order. The Court found that Borax was entitled to $98,664.36 in prejudgment interest.

Thus, the Appellants collectively owe ninety percent of $1,263,261.98 for past cleanup costs and prejudgment interest.

C. **Donald Horne's Assets**

Pursuant to an agreement between Borax and Donald Horne, Donald Horne agreed

to a Court order freezing all his assets except that he was permitted to deplete his assets up to ten percent of their value as of January 27, 1998 [Docs. ## 421 and 428].

**D.    Appellants' Pending Motion**

In their pending Motion, Appellants request that the Court stay the execution of its judgments because they have timely filed a Notice of Appeal. However, the Appellants request that the Court not compel them to post a supersedeas bond pending the outcome of their appeal. Instead, the Appellants suggest that the Court's previous rulings that froze the assets of Donald Horne are sufficient to guarantee that Donald Horne will be able to pay the amount of the Court's judgments in the event their appeal is unsuccessful.

Borax objects to Appellants' Motion. Borax contends that the Appellants should be required to post a bond to ensure future payments to the cleanup efforts. Moreover, Borax argues that the bond should encompass the amount of future cleanup costs and its recoverable fees and costs[1]--not just the past response costs incurred by Borax.

**II.    Discussion**

**A.    Future Cleanup Costs**

Borax argues that the Appellants' bond should encompass the estimated future cleanup costs, which were based on invoices for past response costs, as well as detailed work plans and cost estimates provided to and approved by the Environmental Protection

---

[1]Borax does not offer any authority in support of its argument that its costs, attorney's fees, and post-judgment interest should be included in the calculation of the supersedeas bond. Moreover, the Court has not had occasion to calculate these fees or consider whether the amounts submitted by Borax are the appropriate figures. Therefore, the Court will not include them in the supersedeas bond.

3

Agency ("EPA").  Borax hired an independent expert from URS Corporation ("URS") and he approximated that the total amount of the cleanup costs was $8.6 million.  Borax proposes reducing this amount by the $1,164,597.62 in past response costs that have already been incurred.  Borax also states that the $8.6 million figure should be further reduced by 10% to account for Borax's share of liability under the Allocation Order. Borax states the figure should be further reduced by the entire balance of the funds in the Site Cleanup Account, which is $745,553.85.  Thus, Borax argues that the future cleanup cost figure that can be attributed to the Appellants is $6,691,862.14 (90% of $8.6 million minus $1,164,597.62).  After giving Appellants the credit for the entire balance of the Site Cleanup Account, the total prospective cleanup cost figure according to Borax's formula is $5,946,308.29.

The Appellants claim this figure is an inappropriate basis for calculating future cleanup costs for two reasons.  First, the Appellants assert that the URS bid is too speculative; and second, it cannot be the basis of an appeal bond under the holding in *Fallowfield Dev. Corp. v. Strunk*, 1995 WL 93438 (E.D. Pa. Mar. 3, 1995).  The court in *Fallowfield* refused to include prospective cleanup costs in an appeal bond calculation because "[t]he plaintiffs [did] not come forward with evidence of how much the future cleanup costs [would] be or when, or even if, the costs will be incurred." *Id.* at *2.  In contrast, Borax has already entered into a consent decree with the EPA to clean up the Site, and Borax has presented substantial evidence at various stages of the litigation about the potential prospective costs that will be required to clean up the Site.  Moreover, Borax

4

has submitted, in affidavit form, evidence of some of the costs that it has already incurred to clean up the Site. Thus, the instant case is clearly distinguishable from *Fallowfield*.

Second, the Appellants challenge the URS bid because they assert that it is grossly inflated. In support of their claim, the Appellants proffer a bid that has been submitted and accepted that would provide for soil remediation at the Site. The amount of the bid was $2,745,529.50, and it was submitted by Environmental Management Alternatives, Inc. ("EMA"). URS accepted the bid for the soil remediation project. The Appellants argue that the EMA bid will cover "substantially all of the necessary work" for cleaning up the Site.

Thus, there are two competing bids for future cleanup costs: the bid by URS for $8.6 million of all cleanup costs and the $2.7 million bid by EMA. While the bids both relate to the Site, they are not comparable. For example, under the cleanup remedy developed by URS and accepted by the EPA for the Site, the buildings on the Site have to be decontaminated, demolished and properly disposed of. *See* Ex. J-253 at 4-33. The EMA bid does not account for the expenses that will be incurred in this process; instead, the EMA bid only relates to soil remediation. Although both bids include soil remediation, the URS bid calls for the excavation, disposal, and backfill of 76,500 tons of soil. *See* Ex. J-253 at 4-20. The EMA bid, however, only calls for the excavation, disposal, and backfill of 37,200 tons--less than half the amount of the soil contemplated in the URS bid. Given that the EMA bid does not concern the removal and disposal of the buildings, nor does it consider the same volume of soil that needs to be remediated, the

5

Court will not rely on it to determine the amount of the supersedeas bond that must be posted by the Appellants to protect the shareholders of Borax in the event the Appellants are unsuccessful on their appeal. Instead, the Court will use the initial URS estimate of the cleanup costs as the benchmark for determining the appropriate amount of the supersedeas bond. Borax has already presented evidence of cost overruns at the Site and it is likely that additional cost overruns will occur. Furthermore, the Appellants had an opportunity to rebut the testimony of Borax's expert at the allocation hearing, but failed to do so.

Therefore, in setting the amount of the supersedeas bond the Court will use the $8.6 million figure as its starting point, recognizing that the ultimate cost may be slightly higher or lower. From this total cleanup cost the Court will deduct the following: $1,164,597.62 (past response cost) and $745,553.85 (the entire balance in the Site Cleanup Account).

However, the Court will not give credit at this time to the Appellants for the amount of money that Borax may some day recover from the EPA. If Borax does recover these costs, they are obligated to pay to Appellants their proportionate share of the costs. In the meantime, the time value of that money and the risk of collection must be shouldered by Appellants.

To determine future cleanup costs, the Court must give credit to Appellants for the $1,164,597.62 in past response costs that have already been incurred and $745,553.85, which is the balance in the Site Cleanup Account.

6

## B. Total Amount of Supersedeas Bond

The total amount of the supersedeas bond that must be collectively posted by the Appellants is $7,083,244.07, which is broken down as follows:

1. $1,048,137.86 - 90% of the past response costs of $1,164,597.62;

2. $88,797.92 - 90% of the prejudgment interest of $98,664.36;

3. $6,691,862.14 - 90% of future response costs of $7,435,402.38 ($8.6 million for full project – $1,164,597.62 for costs already incurred);

and

4. A credit in favor of Appellants for the entire balance of the Site Cleanup Account, which is $745,553.85.

## C. Frozen Assets

In his pending Motion, Donald Horne asserts that he cannot obtain an appeal bond because the Court has ordered that his assets are frozen. In its response, Borax argues that it does not object to the Court lifting the stay on Donald Horne's assets so he can obtain a bond. Given Borax's position, the Court will lift the stay on Donald Horne's assets on the condition that he or the Appellants collectively post a supersedeas bond in the amount of $7,083,244.07 within ten days of the date of this Order. This bond will assure that the shareholders of Borax will be protected and at the same time, free up Donald Horne's remaining assets so he can pursue his litigation interests and freely choose how to consume his assets.

## III. Conclusion

Accordingly, it is hereby ORDERED that

(1)     Appellants' Motion for Stay of Execution Pending Appeal [Doc. # 432] is GRANTED, on the condition that the Appellants' collectively post a supersedeas bond in the amount of $7,083,244.07 within ten (10) days of the date of this Order; and

(2)     the Court's Orders restricting the use of Donald Horne's assets [Docs. ## 421 and 428] are amended to allow Donald Horne to post a supersedeas bond in accordance with the terms of this Order.

                                             s/ NANETTE K. LAUGHREY
                                             NANETTE K. LAUGHREY
                                             United States District Judge

DATE: July 20, 2005
Kansas City, Missouri